## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHRISTOPHER HUNTER,

    Plaintiff,

                                        Case No. 2:22-cv-12595

v.

                                        Hon.

SCHOOLCRAFT COLLEGE;
PATRICK STURDY, in his individual and
official capacities; and GLENN CERNY,
in his individual and official capacities,

    Defendants.

---

JENNIFER B. SALVATORE (P66640)
JESSICA LIEBERMAN (P68957)
SALVATORE PRESCOTT
PORTER & PORTER PLLC
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
salvatore@spplaw.com
lieberman@spplaw.com

---

## **COMPLAINT AND JURY DEMAND**

Plaintiff Christopher Hunter, by and through his attorneys, SALVATORE

PRESCOTT PORTER & PORTER, submits this Complaint and states as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Christopher Hunter is a resident of Detroit, Michigan, which is within the Eastern District of Michigan. Mr. Hunter worked for Defendant Schoolcraft College as its Director of Equity and Engagement until his termination in April of 2022.

2.     Defendant Schoolcraft College is a public community college located in Livonia, Michigan. Schoolcraft College is located within the Eastern District of Michigan and is where the violations forming the basis of this action occurred.

3.     Defendant Glenn Cerny is the President of Defendant Schoolcraft College. He is being sued in his individual and official capacities.

4.     Defendant Patrick Sturdy is the General Counsel of Defendant Schoolcraft College. He is being sued in his individual and official capacities.

5.     Claims in this action are for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Elliott-Larsen Civil Rights Act, MCL § 37.2101 et seq.; and for First Amendment retaliation under 42 U.S.C. § 1983.

6.     Plaintiff filed a charge with the EEOC for race discrimination and retaliation on July 22, 2022. Plaintiff received a right-to-sue letter on October 12, 2022.

7.     This Court has subject matter jurisdiction over Plaintiff's federal claims

pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## GENERAL ALLEGATIONS

8.     Schoolcraft College (hereafter "SC" or "the College") is located in Livonia, Michigan, a city with a long and well-known history of racial segregation.

9.     Livonia was among Michigan's notorious "sundown towns" in which it was widely understood that Black people were not physically safe after dark.

10.    Livonia remains homogenous and almost entirely Caucasian – the latest census shows the city to be 87.77% Caucasian and 4.11% African American.

11.    Only 13.7% of SC students are African American, whereas the population of Wayne County, in which the College is located, is 38% African American.

12.    Schoolcraft's homogeneity is the result of multiple factors, including longstanding failures to recruit in areas of Wayne County with large Black populations, such as Detroit.

13.    In or around 2020, the College convened a committee tasked with addressing its long history of racial inequity.

14.    On information and belief, the committee was formed after the College was notified by the Higher Learning Commission that it was at risk of losing its accreditation if it did not increase its diversity.

15.     This committee was charged, among other things, with creating a new position at the College – a directorship of Diversity, Equity, and Inclusion ("DEI").

16.     SC was late to the table, as by 2021, almost all of its peer institutions in Southeast Michigan had had DEI programs and personnel in place for many years.

17.     Plaintiff Christopher Hunter was hired in or around January of 2022 as the College's inaugural Director of Equity and Engagement.

18.     Mr. Hunter is African American.

19.     Prior to his hire by Schoolcraft College, Mr. Hunter served for more than six years as Program Coordinator for CORE (Collectively Oakland Retains Everyone) Center for Multicultural Initiatives at Oakland University in Rochester, Michigan.

20.     Mr. Hunter was highly regarded and successful at Oakland University and brought a wealth of experience and knowledge regarding diversity and inclusion initiatives to his new position at SC.

***Hunter experiences and reports concerns about race discrimination***

21.     Soon after beginning to serve as Schoolcraft's Director of Equity and Engagement, Mr. Hunter himself encountered and raised concerns about racism.

22.     His initial experience with race-based treatment involved his interactions with the College's Chief Student Enrollment Officer, Melissa Schultz.

23.     Because part of Mr. Hunter's responsibilities included diversifying the

College's faculty, students, and vendors, he met with Melissa Schultz shortly after he started at Schoolcraft to discuss student diversity. At the meeting, he asked questions about where geographically the College conducts its recruiting.

24.    Ms. Schultz appeared visibly irked by his questions and would not answer them.

25.    On or around February 14, 2022, Mr. Hunter again met with Ms. Schultz, at which time he requested the College's geographic recruitment data.

26.    Ms. Schultz curtly informed him that she did not have this data.

27.    Two days later, Ms. Schultz's assistant director of admissions reached out to Mr. Hunter to discuss with him how to address student inquiries about diversity.

28.    Mr. Hunter proposed a meeting, which took place on or around March 1, 2022.

29.    The Assistant Director of Admissions invited the entire admissions staff to participate in this meeting. It was productive, and the assistant director provided Mr. Hunter the recruitment data that he had previously requested of Ms. Schultz but that she had claimed not to have.

30.    Mr. Hunter made recommendations to the assistant director based on this discussion.

31.    The next day, Mr. Hunter received a call from Ms. Schultz. She asked

Mr. Hunter how the prior day's meeting had gone and then inquired whether he had requested recruitment data from her assistant.

32.     Mr. Hunter replied that he had done so, as Ms. Schultz had indicated to him that she herself didn't have such data.

33.     Ms. Schultz (a white woman) proceeded to reprimand Mr. Hunter as if he were a child. She scolded him, telling him that his conduct was inappropriate, ordered him not to speak to anyone in her division (which includes multiple departments), and demanded of him, "do you know who all reports to me?"

34.     As Ms. Schultz chastised Mr. Hunter in this manner, she repeatedly asked him: "am I clear, am I making myself clear?"

35.     Mr. Hunter, with over a decade of higher-education experience, was shocked to be spoken to in this manner by a peer; he felt strongly that Ms. Schultz thought it was appropriate to speak to him in a degrading manner due to his race.

36.     Afterwards, Mr. Hunter scheduled a meeting with SC's President, Dr. Glenn Cerny, to talk to him about what had occurred.

37.     On or around March 7, 2022, Mr. Hunter met with President Cerny. Beth LaForest, SC's Director of Strategic Operations, was also present for the meeting.

38.     Mr. Hunter provided President Cerny a status update before turning to Ms. Schultz's behavior.

39.    Mr. Hunter described how disrespectfully Ms. Schultz had spoken to him as well as her refusal to provide relevant and important data regarding recruitment.

40.    President Cerny immediately seemed to grasp what Mr. Hunter was communicating. He volunteered that Ms. Schultz had exhibited similar conduct with another African American colleague, Michael Williams—sharing that Mr. Williams had likewise complained of Ms. Schultz's hostile and aggressive conduct towards him.

41.    President Cerny further shared that Ms. Schultz had previously expressed resistance to recruiting in Detroit, an obvious avenue to increasing diversity at the College.

42.    Shortly after the meeting concluded, President Cerny called another meeting for the following day, to include Ms. Schultz, Ms. LaForest, and Mr. Hunter.

43.    Mr. Hunter believed that the purpose of the meeting was to address his complaint regarding Ms. Schultz's discriminatory behavior.

44.    Mr. Hunter was thus surprised that at the meeting President Cerny failed to address the issue he had raised about Ms. Schultz.

45.    After Ms. Schultz and Ms. LaForest left the meeting, Mr. Hunter let Dr. Cerny know that he was disappointed with his failure to address Ms. Schultz's hostile conduct; Mr. Hunter also shared with Dr. Cerny an email that Ms. Schultz

had just sent him instructing him not to communicate with her reports.

46.     President Cerny responded that he preferred to address such concerns individually with Ms. Schultz.

47.     Mr. Hunter then proceeded to report to President Cerny that two faculty members had recently shared with him a race-based incident in their department.

48.     President Cerny responded by characterizing these faculty complaints of discrimination as "chatter."

49.     Cerny informed Mr. Hunter that such complaints were not within Mr. Hunter's purview and instructed him to forward any future complaints of race discrimination directly to himself and the College's General Counsel rather than addressing them himself.

50.     President Cerny then told Mr. Hunter about a thirty-year tenured African American faculty member who had resigned from SC in January and who had frequently complained about race discrimination at the College, explaining that the discrimination had been investigated but never substantiated.

51.     The disclosure by Dr. Cerny aroused Mr. Hunter's concern. Indeed, just a few months into his employment, not only had he now experienced race-based treatment, but multiple current and former African American staff members and students had also shared with Mr. Hunter a variety of race-based concerns.

52.     These concerns included racial profiling by the campus police; a failure

by Human Resources ("HR") to file grievances following race-based incidents; President Cerny's lack of responsiveness to complaints of racism, despite his ostensible open-door policy; fears of retaliation among African Americans who contemplated reporting discrimination or participating in DEI initiatives; and concerns arising out of a racial climate survey conducted by the College.

53.    Thus, Mr. Hunter took the opportunity to raise with Dr. Cerny these other race-based concerns he had been made aware of, making it clear that he was awake to and concerned about a racially discriminatory atmosphere at the College.

54.    Mr. Hunter heard nothing more from Dr. Cerny regarding his complaints of discrimination and racism at the College.

***Plaintiff is retaliated against following his complaints of discrimination***

55.    Prior to Mr. Hunter's reports of discrimination, he had received praise for his work at Schoolcraft from multiple members of the campus community.

56.    However, on or around April 7, 2022, a few weeks after he complained about racism, Mr. Hunter was called to a meeting that included multiple members of Schoolcraft College's leadership, including President Cerny.

57.    The meeting invitation had "review" listed as the subject, and Mr. Hunter again believed that the purpose of the meeting was to discuss the faculty complaints of racism that he had brought to the President a few weeks prior.

58.    However, as soon as the meeting began, Mr. Hunter realized that the

purpose of the meeting was to discipline him for complaining and to discourage his further efforts to speak up about racism at the College.

59.     Mr. Hunter was handed a "corrective action plan" containing a host of fabrications, misrepresentations and pretextual accusations, ranging from "insubordination" in contacting Ms. Schultz's subordinate; to "excessive use of sick time" resulting from illness and Covid-19 exposure within his family; to "conflict of interest" in arranging for his wife to perform at a campus event and in not informing leadership that a fraternity brother (not a "relative" under the relevant policy) had applied for a position at the College.

60.     One component of the corrective action even centered on Mr. Hunter's efforts to address student concerns about perceptions related to the police presence on campus, perceptions resulting from a history of racial profiling by campus police.

61.     The corrective action also reprimanded Mr. Hunter for comments he had made aimed at ensuring racial and other diversity among speakers at a diversity training series he had created for the College. Astonishingly, the corrective action labeled the effort to ensure diversity as itself discriminatory based on race.

62.     The College's General Counsel, Patrick Sturdy, informed Plaintiff that he had "investigated" Plaintiff's alleged acts of racial discrimination. However, his investigation had not included an interview with Mr. Hunter, in violation of Schoolcraft policy and prevailing norms.

63.    The "corrective action plan" was dated April 7, 2022, and it specified that it was to be reviewed in 30 days' time.

64.    The meeting was largely conducted by Mr. Sturdy, who addressed Mr. Hunter in an overtly hostile manner.

65.    Mr. Sturdy would not allow Mr. Hunter to defend himself against the baseless accusations being leveled at him, choosing instead to question Mr. Hunter's truthfulness and integrity.

66.    The meeting concluded with a demotion of Mr. Hunter's role and the relocation of his office next to those of SC's Human Resources staff and the General Counsel.

67.    Mr. Hunter's duties were immediately curtailed, his movements began to be monitored, and his actions and whereabouts were scrutinized and questioned thereafter by the Head of HR.

68.    What is more, Mr. Hunter was explicitly instructed by the General Counsel that all future conversations and meetings had to be pre-approved by him, and that future diversity workshops must be both approved and co-facilitated by the General Counsel.

***Mr. Hunter makes a report of retaliation and further discrimination***

69.    On or around April 21, 2022, Mr. Hunter submitted a comprehensive rebuttal to the corrective action plan, demonstrating that the accusations against him

were false and misleading.

70.     Regarding his "insubordination," Mr. Hunter clarified that President Cerny had not, in fact, instructed him that he was prohibited from communicating with Ms. Schultz's subordinates; on the contrary, President Cerny had indicated to Mr. Hunter that he would address Ms. Schultz's conduct with her.

71.     Regarding his "excessive use of sick time," Mr. Hunter explained that his absences were due in part to Covid-19 exposure, and that he had continued to work remotely during his quarantine despite being given the runaround by members of the administration regarding protocol for reporting his absence.

72.     Regarding his "conflicts of interest," Mr. Hunter pointed out that no payment was made to his wife for her performance and that he had not, in fact, advocated for the hire of his fraternity brother—who is not his "relative" under the policy in any case.

73.     Regarding his engaging in "discrimination" based on comments he made about ensuring a diversity of participants at diversity trainings, Mr. Hunter clarified his "plan to bring a diverse education program that represents all identities" and explained that he holds a DEI certificate from a Caucasian woman whose trainings he, in fact, recommended to a Schoolcraft colleague.

74.     Mr. Hunter's rebuttal requested a meeting to review the corrective action plan and asked that the next committee be more diverse than the one which

had presented the plan to him.

75.   In addition to submitting a formal rebuttal, Mr. Hunter complained about his treatment to the Chair of the College's Board of Trustees.

76.   Finally, Mr. Hunter requested a meeting with Schoolcraft's Dean of Students, Dr. Marty Heator.

77.   On or around April 15, 2022, Mr. Hunter met in person with Dr. Heator.

78.   During this meeting, Mr. Hunter complained that the corrective action plan – and the manner in which it had been presented to him – was retaliatory and discriminatory based on his race.

79.   Mr. Hunter described the corrective action meeting as an "hour interrogation" during which he was blindsided by a host of allegations about events from several months prior, none of which had formerly been addressed with him.

80.   Mr. Hunter explained to Dr. Heator that whereas before the corrective action he had been on the same level as those reporting to President Cerny, he no longer was, and had effectively been demoted.

81.   Dr. Heator agreed, noting that, "no matter how you slice it, the initiative is now somewhere else."

82.   Mr. Hunter then explained to Dr. Heator that one of the accusations leveled against him at the corrective action meeting related to Mr. Hunter's handling of student complaints of racial profiling by the campus police.

83.     Mr. Hunter shared with Dr. Heator that during the corrective action meeting, he had attempted to protect the anonymity of one of these student complainants, but that Mr. Sturdy had threatened to write Mr. Hunter up for insubordination if he did not disclose the student's name.

84.     Mr. Hunter explained to Dr. Heator that he was very concerned about being forced to reveal the name of the student complainant and had expressed to Mr. Sturdy his fear that the student would be retaliated against.

85.     Mr. Hunter went on to describe to Dr. Heator how the meeting was conducted like an interrogation, noting that although he was a high-ranking administrator at the College, he felt he was being treated like a criminal by College leadership.

86.     Mr. Hunter then explicitly complained to Dr. Heator that leadership exhibited racial bias by telling him that he was not trusted, and by leveling accusations against him based on allegations that Mr. Hunter was not asked about before conclusions were drawn.

87.     Mr. Hunter noted that those present at the corrective action meeting and taking action against him were all Caucasian.

88.     In response to these complaints of discrimination, Dr. Heator explained that he was one of the people to whom SC staff could report discrimination under SC's written policy, and that he had a role under the policy.

89.    Mr. Hunter then went on to report to Dr. Heator that President Cerny had referred to SC staff complaints of race discrimination as "chatter" and that he was highly concerned about this description.

90.    In response, Dr. Heator shared that SC's former president had been openly hostile to diversity initiatives. He then acknowledged that the current president can be "defensive" on certain issues.

91.    Mr. Hunter made clear that he felt he had been retaliated against for speaking up about racism at the College, noting that he had had his "hand slapped" for doing so.

92.    Mr. Hunter reminded Dr. Heator that not only had he been ordered to inform the College's General Counsel and Human Resources about anyone he meets or speaks with, but that Ms. Schultz had similarly ordered him not to speak to anyone in her division.

93.    Mr. Hunter felt that these prohibitions were aimed at preventing him from discussing discrimination in any capacity.

94.    Mr. Hunter further expressed to Dr. Heator that, being from Detroit, he has long been aware of Livonia's reputation, but that he had not expected to have this experience at the College.

95.    Dr. Heator concurred with this observation, telling Mr. Hunter that while those at the College tell themselves they are different, that anyone familiar

with Livonia and southeast Michigan understands the reality.

***Plaintiff is terminated***

96.     Less than two weeks later, on or around April 28, 2022, Plaintiff was terminated.

97.     Plaintiff was terminated ten days *before* the thirty-day review called for under the corrective action plan. Indeed, without explanation, he was not given a chance to complete the plan.

98.     Upon his termination, Plaintiff was then subjected to further demeaning treatment: his personal belongings were searched by the campus police, after which the police escorted Plaintiff from the campus—Mr. Sturdy having informed him that he was now banned from all SC property.

99.     After his termination, Plaintiff submitted a written complaint of discrimination to the College.

100.    Defendant hired outside counsel, attorney Melvin Hollowell, to investigate Plaintiff's complaint and the incidents surrounding his employment at SC.

101.    Mr. Hollowell reached out to Plaintiff for an interview, offering to meet with him before Plaintiff had retained legal counsel.

102.    Plaintiff asked to delay the interview until he had retained counsel, reaching out to Mr. Hollowell immediately thereafter to schedule it.

103.   In response, Mr. Hollowell offered Plaintiff a single date and time to be interviewed.

104.   Because Plaintiff's legal counsel was unable to attend the interview at the sole time offered by Mr. Hollowell, Plaintiff requested some alternative dates, or even a different time on the originally-offered date. Plaintiff left multiple phone messages for Mr. Hollowell and his executive assistant, and sent multiple emails, trying to schedule the meeting, and seeking some alternate dates.

105.   Mr. Hollowell refused to offer any alternative dates. Instead, he informed Plaintiff that he would be wrapping up his investigation of Plaintiff's complaint without ever even interviewing Mr. Hunter.

106.   This despite the fact that an interview with the complaining party is a basic and requisite component of any good-faith employment investigation into a complaint of workplace discrimination.

107.   Schoolcraft's refusal to even interview Plaintiff about his concerns or to conduct a good faith investigation into the circumstances surrounding Plaintiff's employment constitutes further evidence of discrimination and retaliation against Plaintiff.

## COUNT I
## TITLE VII - RACE DISCRIMINATION
### (Against Defendant Schoolcraft College)

108.   Plaintiff hereby incorporates all preceding paragraphs.

109.   Plaintiff is African American.

110.   During his employment with Defendant Schoolcraft College, Plaintiff was discriminated against based on his race.

111.   The race discrimination was intentional.

112.   As a result of Schoolcraft College's conduct, Plaintiff was harmed and continues to be harmed, in that he has suffered economic loss, damage to his professional opportunities and reputation, and emotional distress.

## COUNT II
### TITLE VII – RETALIATION
### (Against Defendant Schoolcraft College)

113.   Plaintiff hereby incorporates all preceding paragraphs.

114.   Plaintiff engaged in protected conduct when he complained of race discrimination to members of Defendant Schoolcraft College leadership.

115.   Defendant was aware of Plaintiff's complaints.

116.   Defendant took adverse action against Plaintiff because of his protected complaints of discrimination by placing him on a performance plan, demoting him, and then terminating him.

117.   Plaintiff's protected conduct motivated this retaliation by Defendant.

118.   Defendant's retaliation against Plaintiff was intentional and/or was with reckless indifference to Plaintiffs' rights.

119.   As a result of Defendant's conduct, Plaintiff was harmed and continues

to be harmed, in that he has suffered economic loss, damage to his professional opportunities and reputation, and emotional distress.

## COUNT III
## ELCRA - RACE DISCRIMINATION
### (Against Defendant Schoolcraft College)

120.   Plaintiff hereby incorporates all preceding paragraphs.

121.   Plaintiff was an employee of Defendant Schoolcraft College and was covered by and within the meaning of the Elliott-Larsen Civil Rights Act.

122.   During the course of his employment with Defendant Schoolcraft College, Plaintiff was subjected to discrimination based on his race, African American.

123.   As a result of Schoolcraft College's conduct, Plaintiff was harmed and continues to be harmed, in that he has suffered economic loss, damage to his professional opportunities and reputation, and emotional distress.

## COUNT IV
## ELCRA – RETALIATION
### (Against Defendant Schoolcraft College)

124.   Plaintiff hereby incorporates all preceding paragraphs.

125.   Plaintiff engaged in protected activity when he complained about race discrimination to members of Defendant's leadership.

126.   Defendant knew about Plaintiff's protected activity.

127.   Defendant took adverse action against Plaintiff because of his protected

activity by placing him on a performance plan, demoting him, and then terminating him.

128.   Plaintiff's protected conduct motivated this retaliation by Defendant.

129.   Defendant's retaliation against Plaintiff was intentional and/or was with reckless indifference to Plaintiffs' rights.

130.   As a result of Schoolcraft College's conduct, Plaintiff was harmed and continues to be harmed, in that he has suffered economic loss, damage to his professional opportunities and reputation, and emotional distress.

## COUNT V
## FIRST AMENDMENT RETALIATION
### (42 U.S.C. § 1983)
### (Against Defendants Cerny and Sturdy in their individual
### and official capacities)

131.   Plaintiff hereby incorporates all preceding paragraphs.

132.   Defendants Cerny and Sturdy are state actors, acting under color of law.

133.   During Plaintiff's employment at Schoolcraft, Plaintiff was informed by Defendant Cerny that his role as Director of Equity and Engagement did not include addressing or discussing complaints of discrimination raised by members of the College community.

134.   Plaintiff was thus engaged in activities protected by the First Amendment to the U.S. Constitution, including the right to free speech, when he discussed general concerns about racial discrimination at Schoolcraft College with

members of the College's community and leadership.

135.   Defendants retaliated against Plaintiff for his First Amendment protected speech by placing him on a performance plan, limiting his interactions with others, and by terminating his employment. Plaintiff's constitutionally protected activity motivated Defendants' adverse actions. Thus, Defendants acted with a retaliatory intent and motive.

136.   Defendants' conduct deprived Plaintiff of rights guaranteed to him under the First Amendment to the U.S. Constitution, rights that were clearly established.

137.   As a direct and proximate result of Defendant's violation of the First Amendment, Plaintiff suffered harm, including economic loss, damage to his professional opportunities and reputation, and emotional distress.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendant as follows:

a.  economic and non-economic damages;

b.  attorney fees and costs;

c.  punitive damages; and

d.  all other legal, prospective and equitable relief determined by the Court to be appropriate.

Respectfully Submitted,

/s/ Jennifer B. Salvatore
Jennifer B. Salvatore (P66640)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
salvatore@spplaw.com

Dated:  October 28, 2022

## **JURY DEMAND**

Plaintiff demands a trial by jury in the above-captioned matter.

Respectfully Submitted,

Dated:     October 28, 2022     <u>Jennifer B. Salvatore (P66640)</u>
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
salvatore@sppplaw.com